Next case of the morning is No. 17-10373, Seismic Wells v. Sinclair Companies. And we'll hear first from Mr. Craddock. Good morning, Your Honors. Good morning. May it please the Court. My name is Tim Craddock, and I'm here today on behalf of Seismic Wells, L.L.C. Now, fundamentally, this case is about a pair of contracts that were designed to protect Seismic from the exact actions that the evidence shown to the jury show that Sinclair I and Sinclair III, along with the help of Sinclair II and Mr. Matthews, took. As Seismic explained at trial, Seismic's most valuable assets are its right to control who operates the Miller Ranch lease and its ability to license the seismic data. Now, both the initial participation agreement and the replacement participation agreement, which Seismic presented evidence was actually fraudulently procured, have provisions that protect against the transfer of Seismic's seismic data without its consent, and also both have protections that protect against the licensee being able to sell the operations to someone else without Seismic having the right of first refusal. Let me ask you a question. Is there a no-assignment clause in the IPA? Your Honor, there is not an explicit no-assignment clause. However, Section 12.3 of both make extremely clear that the agreement is for the benefit of the parties only. Yes, but your client is a very sophisticated fellow, as I assume were Sinclair companies. And a no-assignment clause means no assignment. And, you know, that's not rocket science in Texas oil and gas law. And also, isn't there a principle in Texas law that oil and gas operating interests or working interests are assignable? I'll tell you what the problem is, is the particular sections that were breached, 2.3 of both, which relates to the seismic data, says you shall not share it with any third party. And the assignment of operations, regardless of the transfer from Sinclair 1 to 2 and 2 to 3, ultimately there was anticipatory breach and repudiation of that because they offered for sale to a third party. After your client, how could you possibly maintain that claim after your client had sold his working interest to Bold Energy? Because he still had the right of first refusal to get the operations back. Excuse me? He sold it. And then there's the e-mail that says, and the best thing is, you'll get a right, telling Bold, you'll get a right of first refusal. He sold. Your Honor, fundamentally, these are all fantastic questions, but this case is – I think they're a little more than fantastic. I think they're totally controlling, and it's – What that fantastic question deserves is a fantastic answer. The fantastic answer is that fundamentally what happened here was the court granted judgment as a matter of law, and so we're here on a sufficiency of the evidence review? Correct, after you had a whole chance to present your case. Your Honor, we presented our case, and we believe, obviously, that the district court erred in granting that judgment as a matter of law. I know you – well, you go on with your argument, but speaking for myself alone, I think this is one of the most ludicrous cases I have ever seen, based on the idea that the working interest was assignable. They did two assignments. The bill of sale and notice of assignment indicated that there were changes. Even, you know, leaving aside all this constructive notice and all that business, functionally it's the same group? No contention at all that Sinclair violated any provision of either agreement, other than this, you know, your hypothetical things? So what's important to remember is that in addition to contract claims, there are fraud claims, and in addition to assignment, there are issues with the seismic data, and with respect to what I believe is probably – your Honor is probably referring to the record on pages 4124 to 4126, which is this assignment and bill of sale. We presented evidence at trial, seismic presented evidence at trial, that the form of this assignment was actually different than the form of the agreed-to assignment, and that the assignment and bill of sale that was presented to him, to seismic, along with all of the representations made in the replacement participation agreement, led seismic to believe that it was dealing with the same party that it had entered into the initial participation agreement with. And as a result of that, seismic has also maintained that there are fraud claims here, including statutory fraud, including secondary liability for statutory fraud. And what's important to remember is – But I think that the question goes to kind of a bottom line. Why isn't this just some hyper-technical thing, where you have a corporate reorganization, Katharina Doubleday got married and became Katharina Haynes, but it's just a reorganization of my life, if you will? Why isn't that just kind of hyper-technical to go after them, fraud or any other theory? Sure. One reason it's absolutely not hyper-technical is because Sinclair III absolutely put operations up for sale, actually entered into a memorandum of understanding with EOROG. It was actually a deal that was signed for $900 per net acre. It was ultimately an $18 million deal. But they didn't sell, right? They didn't sell. But what happened was when Seismic Wells noticed this was online for sale, he wrote Sinclair a letter and he said – He threatened to sue Bold, too, didn't he? But he didn't sue them. Bold is not in this lawsuit. I understand that. But, I mean, that would have looked really bad since he had sold his interest out to Bold, specifically representing that they would obtain the right of first refusal. I can't speak to why Bold is not in this lawsuit. I bet you can't. I don't represent him. I wouldn't have asked my client either. With respect to any potential lawsuit against Bold. But what did happen is when he asked them to confirm that they would honor the right under Section 9.4, they told Seismic Wells in no uncertain terms that they could transfer and sell the operations, certainly without his consent and even without the lessor's consent. That's on page – Well, that's right because then they went on and said because you don't own it anymore. Well, what they said was actually there are several contracts or there are several documents that relate to the replacement participation agreement. You have the replacement participation agreement and then you have the bill of assignment. And the replacement participation agreement explicitly reserves the right that he should have, the right of first refusal, to regain the operations. And what their attorney said is that in the same breath, he must have both retained that right and assigned that right in the same deal, which frankly simply doesn't make sense and is not supported by the assignment and bill of sale. That was their basis for claiming that he had no ability to prohibit them from transferring those operations. The benefit of the bargain, one benefit of the bargain here was this right to the return of operations. And so fundamentally, that's why it matters. Now, we believe that the transfer between the entities is also – How does that exist after he has sold his underlying interest in the lease? How does he get any benefit of an operating – of a participation agreement among working interest owners on the lease when he's sold out presumably for fair market value? Well, because he could still be named operator. Excuse me? He can still be what? He contracted to have the ability to have operations returned to him, and they refused that. Even though he had sold out? Your Honor, allow me – I will address this question. I will address this question on reply. I'm going to have to go back and look at some of my notes that are over there. Yeah, well, I would appreciate a case citation or two also, because it seems to me that if you have an agreement, you know, you have some kind of working interest agreement between yourself and a fellow working interest owner, and it may reserve whatever it reserves. It might reserve the right to audit the books of the operator. But once you have sold your interest in that working interest, you're not privy to that contract anymore unless you've retained something, which I didn't see any indication of. It's not your contention that Bolt had an obligation to give you a first choice before signing the rights or selling the rights. Is that right? I do not know what Seismic's contentions are with respect to Bolt in this case. Well, that seems essential. I mean, if you have no claim against Bolt, and Bolt is the one that actually is the operator, then it seems to me that if you have no rights against Bolt, it would be hard to conjure up a cause of action that you had against Sinclair. And are you talking about the data? Is that all that you're talking about? So there are two issues here. One is the data, and with respect to the data specifically, there's a case, Kerr-McGee. It's out of the Tenth Circuit. It's not out of this circuit, but you had a very similar situation where you had a family of companies, and their contention was that we are a family of companies. Why should it matter if we share the data among that family of companies? There, the Tenth Circuit agreed with the plaintiffs that it was a violation of the license agreement to that seismic data and actually affirms damages on that because what they found was that they should have received an additional license. So I'm trying to answer your question. There are two issues. There's the seismic data issue, yes, and there's the operations issue, yes. And there's also— What do you want here? In other words, if we ruled in your favor, what would happen next? We should—this case should be remanded for further proceedings, for a new trial. What happens if it were remanded? If it were remanded for a new trial, we would present our case to the jury on two breaches of contract, on our fraud claims and our conspiracy claims. What would your damages be? Our damages would include, first, on the fraud claims, even under statutory fraud. You can get actual damages, and if you can show actual knowledge, you are actually entitled to exemplary damages without any actual damages. That's under 27.001D, and 27.001C also allows that. Are you conceding there are no underlying damages? I am not conceding there are no underlying damages. What are the underlying damages? The underlying damages include that seismic should be paid for a license from Sinclair 2 and from Sinclair 3 for the use of its seismic data, which they never paid for because it was transferred from 2 and to 3. Sinclair owes you damages from assigning to Sinclair 3, Sinclair 1, assigning to Sinclair 3. What is your actual damages? The actual damages include licensing fees for the seismic data from Sinclair 2 and from Sinclair 3, which is very closely aligned with the facts in the Kerr-McGee case. You have to concede, it seems to me, that that is highly technical. I don't believe that is highly technical. Is it sort of analogous to copyright, that what is the harm to John Grisham or something if I take one of his novels and start selling it and don't pay him any royalties? The harm is he misses out on the royalties. That's correct. Is that kind of an analogy here? That is absolutely analogous to what's happening here. You know, just like if I started a company and then I started a second company, I couldn't share my copy of Microsoft Office with the second company. They would absolutely tell me that that's a breach of the license agreement. So that is one measure of damages here. When you sell data, you've got to be sure people are incentivized to buy it. And if you can't sue them because they shared data with somebody else and get the cost of what that would have cost, then everybody will just buy one copy and send it to the world. That's correct, Your Honor. But you have already sold it. But we didn't sell it. We only licensed Sinclair One with the data. You can look at Section – You licensed Bolt only to a license on the data? We gave Sinclair One a license to the data. What did you give to Bolt? What did you sell to Bolt? I'm not sure if we licensed – I'm not sure what was given to Bolt with respect to the data. I'm not sure whether I have any property here at all. I'm here to assert rights to property, but I'm not sure if I have it. Your Honor, just like I could write software and give Your Honor a license to that software and Your Honor a license to that software and Your Honor a license to that software, the fact that I can license it to multiple people doesn't mean – They may have sold it. So these breaches, the transfer of the seismic data from 1 to 2 and 2 to 3 all happened in 2006? So it's before the sale to Bolt. Right, so it's before the sale, and those breaches were actually fraudulently concealed by the Replacement Participation Agreement, which, as we've discussed in our briefing, contains numerous misrepresentations regarding the identity of the party. So is it your position that even if you sold the rights to the data to Bolt that you would still have the right to sue for the pre-sale breach? Absolutely. Absolutely. So we understand your case completely. Set out 1, 2, 3, 4, what your case is for reversing the district court. Your Honor, this court should reverse the district court because we presented sufficient evidence on each element of the claims that are here today. We presented sufficient evidence that the Initial Participation Agreement was breached. We presented sufficient evidence to the jury that Sinclair 1 and Sinclair 3 committed statutory fraud under Section 27.001. We presented sufficient evidence that Sinclair 2 and that Mr. Matthews committed or should be held secondarily liable for that statutory fraud under Section 27.001D, I believe it is. We also presented sufficient evidence regarding common law fraud, regarding failure or fraud through nondisclosure, and conspiracy. So my point is we have an order here from the district court, You also have a red light. Excuse me? You also have a red light. Let him finish his sentence. You can finish your sentence. Okay. With that, I will reserve my remaining time. All right, sir. Thank you. Mr. Hank. Yes, Your Honor. May it please the Court. My name is Pete Hank and I represent the Appalese. Under Rule 34.4, I will address key reasons why the Court should affirm on the 2006 claims and my associate, Mr. Walther, will address an additional reason on those claims, which is statute of limitations. And then he will also address why the Court should affirm on the 2014 claims. He's going to talk about the court reporter. Mr. Walther will handle that, Your Honor. Judge Haynes, I had the same reaction when I first got assigned to this case, which is what difference would it make? This was a corporate restructuring. And the conclusion that I reached is this was a more than eight year after the fact attempt to take advantage of a corporate restructuring. And the reason that's obvious is there are two very dubious allegations on which the fraud claims are based. One is that Seismic says it was duped into thinking that it had entered the replacement participation agreement with Sinclair One instead of Sinclair Three, even though it says Sinclair Oil and Gas Company expressly as the contracting partner. But wasn't that a DBA of Sinclair One? It was through 2003, Your Honor. It was not in 2006. Okay. I mean, I just, it's a little shocking to me that it's the duty of the other side to a transaction to go around looking up the Texas Secretary of State every other day when you know something's a DBA and assume that they're going to run around changing that. And it just, I'm just struggling with that a little bit. The idea that this was somehow on Seismic to know all this stuff when you all are the ones using the same guy to sign the agreements, using the same names, it does seem like that's on you. First off, Your Honor, Mr. Walther will address the limitations argument, but we don't need to rely on public documents and searches. As you will hear, there are documents that went straight through Mr. Tranchino's hands, which put him on notice that these were completely distinct entities, including one that you have in your binder, Your Honor, which is an assignment. It made it perfectly clear that these were distinct entities. But then you're kind of trying to have it both ways. You started out by, yeah, Judge Haynes, you were right, this is just a restructuring. But now you're saying it's clear they're distinct entities. Well, if they're distinct entities, then you have this problem of the data transfer, the sort of copyright analogy that I perhaps imperfectly made. Well, if I could address that, Your Honor, we think there are at least seven reasons why that claim fails, a whole host of reasons. Give me your best because you're almost out of time. Yes, Your Honor. First, it's premised on the fraud claims. If they don't prevail on the fraud claims, then they lose on this claim. Also, Your Honor, Mr. Tranchino admitted at trial, this is page 10680 of the record, that he had no proof that more than a single employee accessed the data. So what you have here, which is very different than Kerr-McGee, is you have one employee of Sinclair 1 accessing the data. You have a corporate restructuring. That person, Mr. White, became an employee of Sinclair 3. And they're saying just by virtue of him changing hats, just by virtue of, and that was your analogy, Your Honor, of your last name changing, that this is now a breach of the agreement and that somehow Sinclair was taking advantage of this seismic data. Additionally, Your Honor, there's no evidence of any harm from that. What they would have had to establish is that Sinclair would have paid for both of these entities to have access to that data. There was no evidence of that. But that's not the question. The question is whether Seismic would have charged for that and said Sinclair 3 can't use it unless you pay me. Then whether they would accept, that's a different question. But then you wouldn't have a contract, Your Honor. Right, but they're saying they only had a contract because you lied to them. Well, but they have no evidence of even intent to defraud. In fact, counsel admitted, if I could just finish this answer, Your Honor, at page 10855 of the transcript, plaintiff's counsel told the trial judge, and I'll quote, I can't rest until I call her. And he was referring to Ms. Meehan, the company employee who supposedly was the mastermind behind this fraud. Counsel said, I can't rest, and on the issue of intent, Your Honor, and then inexplicably he didn't call her before he rested. So what would a trial judge do when they're told on a claim I have to call a particular witness, don't call that witness? I would never sit through a five-day trial and not submit it to the jury. So that's what a trial judge would do. Well, half of me wishes that too, Your Honor. I impeached the plaintiff about 22 times during cross-examination, so I appreciate trying to gauge the jury and so forth. But the point is, was it appropriate to grant JMOL? Sure, there are judges that would have reserved and then see what happens. This wasn't fully tried, right? This was granted after the plaintiff rested. Correct, Your Honor. I mean, so it wasn't fully tried. Well, your time is way up. Thank you. Mr. Walther. May it please the Court. My name is Benjamin Walther. I represent Neapolis. Like Mr. Hanks said, I'm going to be addressing the 2006 claims for the statute of limitations, and I'll also be addressing why this Court should affirm the trial court's JMOL as it relates to the 2014 trial. How can you address statute of limitations, which is an affirmative defense? Our position, Your Honor, is that that was one of the lead arguments in our Rule 50 motion. The Court expressly stated it was, after having considered our motion, both the oral arguments of it and the written motion, that it was granting our Rule 50 motion. Right, but it's your burden of proof, and y'all have it gone. Well, the point is that it was fraudulent. Actually, you plead statute of limitations. That may appear to be all right, but then they can rebut that with fraudulent concealment. Yes, Your Honor. And so you're saying that, as a matter of law, there's no evidence of fraudulent concealment. Is that what you're saying? Yes, Your Honor. In their Sysakwell's brief to this Court, it actually argued both the discovery rule and fraudulent concealment. I'm sorry to interrupt you, but to clarify things in my own mind, this is not a non-assignable agreement, either one, the IPA or the RPA, right? Absolutely. In fact, at the trial court, we presented evidence that one of the early drafts of the initial participation agreement explicitly had a no-assignment clause in it. Mr. Tranchino himself asked us to remove that clause because he knew that this situation would occur where he would want to sell his own interests, like he did, to Bold Energy. So we took that provision out of the contract. I know plaintiff's counsel has cited the Kerr-McGee case in reference to this licensing issue with respect to the seismic data and the initial participation agreement. The licensing agreement at issue in Kerr-McGee explicitly said, you can't license this to your subsidiary. That's not what our contract had. Our contract said that you could use the seismic data. You couldn't sell, trade, or license it. And the reason for that is because Seismic Wells and Sinclair were co-working interest owners. The point of the seismic data was to be able to find oil on the lease and develop it jointly. Seismic Wells wanted Sinclair to have this data so that Sinclair could figure out where it should drill the next well. Now, with respect to the seismic data, Seismic Wells actually gave Sinclair One a free license to the data. It didn't assess any value to that data at all as part of the initial agreement. And the same thing with Bold Energy. It gave that data to Bold Energy, again for free, the only value for both of those contracts related to the working interest, not to the seismic data. How do we know that? That is in the record, Your Honor. Matt? Actually, I don't have the site in front of me right now, but I could, if you would like, I could submit a… 28-J after court. Thank you. Okay, I want to ask about the court reporter. And I will say I was chair of the Texas Court Reporter Certification Board for three years when I was a state court judge, which they don't govern federal court reporters. I get that. But to me this is shocking and wrong, and I'm surprised that you all even make an issue of this instead of trying to work it out on what came in. Because if your position is there really isn't any evidence out there, then just stipulate to the depositions they say they put on and be done with it. Why are we even fighting about this? The reason that we had an issue, Your Honor, is that at trial we twice had to interrupt them because they weren't playing our counter-designations. So then we finally got that issue resolved, got the clip report, and then we reviewed it. The next day they played the video. It turns out they again played the wrong video. So we don't find that out. They didn't actually tell us, although they knew. Okay, but the court reporter is not recording evidence in the trial. I mean, if this had happened in a state court, that would be something that would subject the court reporter potentially to sanctions, including potentially losing their license to be a court reporter. I can tell you that's a very serious thing because there's really nothing else for a court reporter to be doing than reporting what happens in court. So regardless of whether you think they were fair to you or you were fair to them, you all fought over the – whatever was played was played. Is there something they could have played that would have made the difference and now there would have been a fact issue but they forgot to play it? Is that your position? Our position is simply that we don't know what was actually played because we had so much confusion with it. But regardless, none of that evidence actually mattered. Okay, so do you waive that argument and accept their – They're not waiving it. It's the other side that's making that argument. No, do you waive the argument that their presentation of what the record should be supplemented with is correct? Sure, Your Honor. Our position, as we said in our brief, was if the court believes that that evidence actually is necessary to address this Rule 50 issue, then we would be okay with the court allowing that evidence in. The point is that Sizemore Wells only cited, I think it was like five minutes, of that testimony that it claims is so crucial. Okay, so then I don't even know why we're having this debate. You should have agreed to the motion to supplement instead of just being angry that there's some mistake in how they played it. I don't even – I just don't even understand it because to me it's not an answer for the district court to just rope their hands and say,  and the court reporter failed to take it down, and that would result in a new trial in most cases, which I assume you don't want. That is correct. We do not want a new trial. So you accept their supplementation? Yes, Your Honor. Okay. So in terms of the 2006 claims for the statute of limitations, like I said, our position is that Seismic Wells was required to actually present sufficient evidence to support both its fraudulent concealment argument and the discovery rule to defer the accrual of its claims. Fraud and breach of contract, which are the two 2006 claims, those generally accrue on the date that the alleged fraud or breach is committed. So the only way for those not to have expired in 2010 was if Seismic Wells could establish that the discovery rule or fraudulent concealment would apply. For the discovery rule and its breach to this court, Seismic Wells only argued that the discovery rule should apply to its breach of contract claim. And the only case that cited and supported that was actually Judge Jones's opinion in the Beavers v. Metropolitan Life case. In that case, the court actually said the opposite. The court said that no Texas court has ever applied the discovery rule to a breach of contract claim. So I think we can set that argument aside. That leaves fraudulent concealment. Seismic Wells took the position in its reply brief to this court for the first time that Sinclair bears the burden to actually disprove fraudulent concealment. The only case that cited and supported that wasn't- Well, you have to prove that there is no issue as a matter of law. So don't worry about it.  I'm sorry, Your Honor? They are able to rebut statute of limitations by saying there was fraudulent concealment. For purposes of a JMOL, don't you have to prove that there was no genuine issue of material fact concerning fraudulent concealment? Yes, Your Honor. Okay, that's all you need to say. Okay, yeah, I think Seismic Wells has to present some evidence suggesting that Sinclair actually did fraudulently conceal these claims. And to do that, and so- Well, they did do that. I mean, you know, well, I'm not sure whether they did it sufficiently, but they certainly made those arguments in their brief. I certainly agree that they did make arguments, but I agree that also it was not sufficient. If you look at the document that we provided you all in the notebooks, that's the assignment and bill of sale that corresponded to the replacement agreement. That document put Seismic Wells on notice of its claims as early as October 25, 2006, the day it signed this assignment and the same day it signed the replacement participation agreement. On the first page of the assignment, right at the very top, it says that the assignment is between Seismic Wells as the assignor and Sinclair Oil and Gas Company, that's Sinclair III, as the assignee. Then on the second page, the last paragraph, it has what the parties have been referring to as the clarification provision. The first sentence of that provision says, for purposes of clarification and acknowledgment, references made to the certain assignment and bill of sale by and between assignor, that's Seismic Wells, and Sinclair Oil Corporation the first day of June 2005. That's referencing the initial participation agreement between Seismic Wells and Sinclair I. Then on the third page, at the very top, it says Sinclair Oil Corporation on or about March 1, 2006, assigned to Sinclair Oil and Gas Company, therefore the interest conveyed in the first assignment of interest. Seismic Wells, the crux of its fraud claims and its way to get around the statute of limitations, is arguing that it didn't know that Sinclair I assigned its interest in the Miller Ranch lease to Sinclair III, and it didn't know that Sinclair III was the contracting party to the replacement agreement. This assignment right here that Seismic Wells signed explicitly told Seismic Wells. It reminded Seismic Wells that Sinclair I was the party to the first agreement. It informed Seismic Wells that Sinclair I had assigned its interest to Sinclair III, and it said in the very first paragraph that Sinclair III was the contracting party to the replacement agreement. That's Seismic Wells' entire case. Now Seismic Wells' way to dispute this evidence is it claims it didn't read it. It said actually it read a draft version of this that it never signed, and it thought that Sinclair I was assigning its interest to itself. And then it said when confronted with the clear language of this assignment, it said, well, I didn't bother reading the version that I actually signed. Well, that's not Texas law. Every first-year law student learns that you are deemed to have read and understood the context of a contract, and that's especially true for a business deal with sophisticated entities tolling almost a million dollars. I don't know actually if Seismic Wells had a lawyer or not as part of that deal, but the fact is that Seismic Wells could have had a lawyer. It was a deal for almost a million dollars. So at the end of the day, it doesn't matter if Seismic Wells actually read this assignment or not. What matters is that it could have read it and that it should have read it. And had it read it, it would have known that its claims, that the inaccurate recitals that were contained in the replacement agreement were inaccurate and that Sinclair III was actually the contracting party to the replacement agreement. Its claims at that point had accrued, and it should have filed its lawsuit many years before it actually did. Their argument is they did not read the contract that they signed. Yes, Your Honor. For the 2014 claims, I'll just briefly address them. The main one is the repudiation claim. Seismic Wells claims that Sinclair III repudiated the replacement agreement by saying that Seismic Wells didn't have a right to operate in the event of a sale. It's important to remember that Miller Ranch Lease consists of 20,000 acres, and that's divided into two portions. The first portion consists of 19,800 non-operated acres. At trial, Seismic Wells conceded that it had sold 100 percent of its interest in that portion of the lease to Bold Energy, and that the correspondence leading up to that sale, it clearly stated time and time again that it was including the subsequent right to operate to Bold. Well, even if they hadn't explicitly talked about that, if you assign your whole interest, you assign your whole interest, right? Absolutely. I mean, you don't, because to do otherwise would be splicing up the RPA, and unless you told the person you were selling to that I'm reserving such and such a right in the RPA, it's assigned. Absolutely. Well, that's that. What did, I mean, did your side move for summary judgment before Judge Cummings? Yes, Your Honor, we did. I forgot, on what basis did he deny it? The judge's order was only one sentence long, I believe, or maybe it was two sentences. It said that it found that there were fact issues. At trial, Seismic Wells made several concessions that we believe are dispositive, and that was the basis for the Rule 50 order. Okay. Such as? Well, for example, just like I was just referencing, Seismic Wells conceded that it sold 100 percent of its interest to Bold Energy. It conceded that it had written the e-mails that went to Bold Energy saying that it would include the right to operate. So those issues Seismic Wells conceded at trial. What was left of their case once they made those concessions? The only issue left of that case would be its fraud claims, which we believe were clearly time-barred and then failed also on the merits. And then Seismic Wells also maintained one of its 2014 claims, alleging that Sinclair breached the contract by not assigning the MSU No. 2 well. After it discovered a casing leak, it decided to plug that well. Seismic Wells only spent one sentence in its opening brief on that claim, and there's a host of problems. Has anything said about specifically reserving their claims as to the data? Well, for the data, Your Honor, the important thing there is the replacement agreement specifically gave Sinclair III the right to use that data. Okay, let me ask you, because you quoted that line to us from your notebook, and you said their argument is that they didn't read it, but actually they also argued that Ms. Meehan's statements to them made them think that it was just assigning Katharina Doubleday to Katharina Haynes, Doubleday being my maiden name, and that that made them think it's the same person as opposed to a new entity, which is understandable given that oil and gas was the DBA of Sinclair I. So for Ms. Meehan's statements, that was based on Seismic Wells' alleged recollection of the exact words of a statement that was made nine years ago. But for that actual statement, Ms. Meehan, that was her third day on the job. Okay, but this is all factual. I mean, this is credibility. This isn't a j-mal. I'm just saying you said their argument was we didn't read the contract and you have to read your contract and all that, but actually their argument was Ms. Meehan made us think it was just Katharina Doubleday fixing her name because she's now married to Haynes. So Texas case law is clear that plaintiffs have a duty to investigate if they have actual knowledge of something that seems awry. You can't just accept someone's word if you have a reason to suspect that it might be inaccurate. You have a duty to actually figure out what's going on. Seismic Wells conceded at trial that it could have asked Ms. Meehan what she meant whenever he got this assignment and signed it. It just didn't. Instead, it waited nine years to file a lawsuit. Seismic Wells at any point could have asked for clarity about how that corporate reorganization actually took place if it wanted to know. Okay. I'm sorry. I asked you a question, but you had a red light. All right. Thank you very much, Your Honor. I appreciate it. All right, sir. Mr. Craddock? Yes, Your Honor. To address what we were just discussing, my colleague referenced 19,800 acres. What he didn't discuss were the 200 acres. What it seems to me is important, at least to me, is what did you or did you not say that the reason we didn't know what was in that contract is because we didn't read it? That is incorrect, Your Honor. What did you say? That Ms. Meehan told us, hi, my name is Ms. Meehan, and she represented that she was – Did you read the contract? He – so he absolutely did because as part of the joint operating agreement, there was a form – He read the contract. Was it in the contract? Was it exactly the words that we had been represented that were in the contract? So here's exactly – Don't excuse that, right? Here's what happened. What is your excuse? Now you tell me what your excuse is. Here's what happened. What? The replacement participation agreement contained a form that was the agreed form of the assignment. Yeah, but this is a million-dollar deal and you're dealing with sophisticated people, not somebody herding sheep on a remote hill in Texas somewhere. We're talking about people that know what they're doing. Well, Mr. Trinchino was not represented. Maybe he should have been. I'm not sure. The point is they made –  they had prior to that made repeated representations that led Mr. Trinchino to believe that – Did he have an obligation? Did he have an obligation to read it before he signed it? I think that he would testify that he did read it before he signed it because what he read was the agreed form. They had agreed that it would be of the form. He misread it? Additionally – Is that what he said? He misread it? No, he read the one – he read the copy that was the agreed form that it would be. In any event, he believed, as he explained on the record, that it was a corrective assignment. Your roundabout answer is – what I'm hearing you say is he said he didn't read it, he didn't read it, and that is why he didn't know it. And it was a million dollar deal, as I understand it, and he's a sophisticated man in a business that he'd been in for some time. He knew all of the consequences. I mean, why should he not be held liable for what was in a document? But what the jury also heard – You said he signed. You said he signed. What the jury also heard was all the – No, no, no. Just answer my question. Because it's not for us to decide. It's for a jury to decide. It's question of fact. I think that's a matter of law. Okay. So the question of fact is whether he would have reasonably believed that this was simply a name change for Sinclair 1, rather than an actual transfer from Sinclair 1 to 3, based on what Meehan had told him. That's correct. Okay. He believed it was a self-corrective assignment. So it's not a matter of whether he read it. It's a matter of what he had understood being, again, the double-data Haynes name change versus I have a sister-in-law named Kathy Haynes, who's a different person from me, Katharina Haynes. And so that's a different issue than maiden name to married name. Precisely. Precisely. I'm misinformed about Texas law, but is that a defense to fulfilling your obligations on a contract? I didn't read it. I relied on your employees to tell me what was in it. Well, here there's no question that Seisman fulfilled its obligations. You cite me a case that supports that. I may be wrong. I don't know. Seismic is not contending, or rather Sinclair is not contending that Seismic didn't fulfill its obligations. Seismic fulfilled its obligations. Wait a minute. That's not what he's saying. Oh, maybe I misunderstood, Your Honor. I think that's talking past each other. His point is, if this were an insurance case, and he were the policyholder, and he said that the insurance agent misrepresented him about what the policy contains, he would lose as a matter of law. I mean, there would be summary judgment. We'd have no oral argument. He could claim fraud as far as the cows come home. But he would lose as a matter of law. So the difference here is what they're arguing. I'm sorry, Your Honor. I see that I'm running short on time. Go ahead. May I answer your question? Sure. Okay. The difference here is they're relying on this particular provision to claim that we had notice, right? And notice is what's the question of fact. They're claiming that we had notice, and that's why the statute of limitations should not be told. It's not about any particular obligation under the contract itself. Seismic performed its obligations under that contract. It's not trying to get out of those obligations. What the difference is is it's about notice. And additionally, we'll supplement the record with the bold assignment, which was for a non-operated working interest and excluded the military unit. Your Honor, we ask that this Court reverse and remain in this case for further proceedings. Thank you. All right. Thank you.